# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2146
_____

United States of America

*Plaintiff - Appellee*

v.

Jacob Edward Walls

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Arkansas - Harrison
_____

Submitted: January 14, 2022
Filed: May 27, 2022
_____

Before SMITH, Chief Judge, WOLLMAN and ERICKSON, Circuit Judges.
_____

SMITH, Chief Judge.

Jacob Walls pleaded guilty to willfully setting fire to public lands, in violation of 18 U.S.C. § 1855. The district court[1] calculated a Sentencing Guidelines range that,

_____

[1]The Honorable P. K. Holmes III, United States District Judge for the Western District of Arkansas.

if imposed, would exceed the statutory maximum. Believing that Walls's conduct warranted a substantial sentence, the court sentenced Walls to the statutory maximum sentence of 60 months' imprisonment. On appeal, Walls contends that the court procedurally erred in calculating his Guidelines range and that his resulting sentence is substantively unreasonable. We affirm.

## I. *Background*

At the time he committed the instant offense, Walls was living in a cabin adjacent to the Buffalo National River in northern Arkansas. Walls was on probation for a possession-of-methamphetamine offense and had a warrant out for his arrest. Walls's cabin was in the vicinity of a structure called the Indian House, a large wooden house built in the 1900s. Chuck and Carol Biding owned the Indian House and lived in another home nearby but would often stay there overnight.

Walls illegally harvested timber from a fallen oak tree within the Buffalo National River boundary not far from Walls's cabin, in violation of 18 U.S.C. § 641. He cut it up into firewood, creating significant debris. Walls attempted to burn the debris using two different fires with accelerant from a "Jerry Can." R. Doc. 28, at 6. He later told federal law enforcement that he then left the fires to get something to eat and to rest. He stated that the fires were well-contained when he left them but that when he returned they had gotten out of hand. Rather than notifying the appropriate officials, Walls sent text messages to a friend that evening stating that he had "caught half the park on fire" and described the fire as an "uncontrolled" burn. *Id.* at 6–7. Walls never reported the fire and instead tried to flee the area. He later admitted that he did not report it to avoid being connected to the start of the blaze.

That evening, Carol Biding was at the Indian House and saw the fire. She called her husband, an employee of the National Park Service (NPS), and he reported the fire to the NPS dispatch center. NPS firefighters were dispatched.

Fenn Wimberly, the fire management supervisor for the Buffalo National River, testified that the fire occurred in a "pretty remote area of the park" with "steep, rugged terrain, lots of rocks, [and] lots of drop-offs." R. Doc. 43, at 10. He also testified that there were "a lot of dead, standing trees out there" killed by a ice storm and, due to no recent fires, "the leaf litter, the sticks and things that were out there on the ground that have potential to burn were quite deep and quite readily available to burn." *Id*. He stated that the same day of the fire, he and his fire crew had undertaken a prescribed burn nearby and "the weather conditions were, for February, quite warm and windy, with gusts to 15 miles an hour to the south." *Id.* at 9. By evening, the winds had died down. He also testified that if the fire had not been reported, and without the quick response to the fire scene, "the fire had the ability to grow to 15 or 25 acres probably based on where it was" in the forest. *Id.* at 22.

Wimberly further testified that "[w]e prefer not to take action on a wildfire after dark," calling it "really risky business," *id.* at 17, because it would be "easy for somebody to fall in a hole, get backed up in a fence, fall off a rock," or to be injured by a falling dead tree, *id.* at 10. Despite these risks, the firefighters engaged the fire in the dark because the fire threatened the Indian House and other structures. The fire crew positioned its brush truck, with its water capacity, at the Indian House to protect the house from the fire. Although a road or driveway separated the Indian House from the forest, Wimberly testified that "[t]he conditions . . . earlier that day had the potential to spot across that . . . road," meaning that the wind could carry embers onto the Indian House. *Id.* at 37.

Ultimately, the fire burned to within approximately 35 yards of the Indian House. Wimberly testified that when he arrived at the Indian House, Chuck Biding was concerned about the situation and had been looking for a rake to protect his house by raking away leaves from it. To contain the fire, members of the fire crew built containment lines "using leaf rakes and leaf blowers and hand tools." *Id.* at 26. Portions of the fire eventually self-extinguished, while others "required the building

of a fire control line." *Id.* at 28. Although "the fire was demonstrating a low intensity spread," *id.* at 30, Wimberly testified that the fire was "still a wildfire or forest fire or an out-of-control fire" and "would have continued to burn" if not for fire suppression efforts or for the rain that fell that evening, *id.* at 43. Wimberly testified that, because it was dark, the firefighters had to use headlamps and the light of the fire to navigate the terrain and that one of the firefighters became entangled in a barbed wire fence that cut through his protective equipment and had to get first aid. In total, the fire burned about three acres of the Buffalo National River forest.

Walls pleaded guilty to willfully burning timber, underbrush, grass, and other material on public lands owned by the United States in the Buffalo National River, in violation of 18 U.S.C. § 1855. The presentence report (PSR) recommended a base offense level of 24 pursuant to U.S.S.G. § 2K1.4(a)(1). Section 2K1.4(a)(1) applies if the offender knowingly "created a substantial risk of death or serious bodily injury to any person other than" himself. The PSR found that Walls had created a substantial risk of death or serious bodily injury to the firemen, nearby residents, and potential visitors to the Buffalo National River area. The PSR also applied a two-level increase pursuant to § 2K1.4(b)(1). This provision is triggered when the relevant offense was committed to cover up another offense. Its application was based on the finding that Walls set the fires in order to conceal his illegal timber harvesting. Walls's criminal history score totaled 15 points, including two points for committing the offense while on probation. Thus, Walls's criminal history category was VI. After a three-level reduction for acceptance of responsibility, his total offense level was 23, correlating to a Guidelines sentencing range of 92 to 115 months' imprisonment. As the statutory maximum sentence for his offense was 60 months' imprisonment under U.S.S.G. § 5G1.1(a), this became his Guidelines sentence.

At sentencing, the district court heard from counsel and Walls and noted that Walls had requested a downward variance. The court explained its weighing of the sentencing factors under 18 U.S.C. § 3553(a). The court found that the fire had

created a risk of death or serious bodily injury to the firefighters and that Walls had created that risk knowingly. The court adopted the PSR and its Guidelines calculations without change and imposed the statutory maximum sentence of 60 months' imprisonment.

## II. *Discussion*

We review a district court's factual findings for clear error and its application of the Sentencing Guidelines de novo. *United States v. Gamboa*, 701 F.3d 265, 266 (8th Cir. 2012). We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Washington*, 893 F.3d 1076, 1080 (8th Cir. 2018).

Walls presents three arguments on appeal. First, he argues that the district court erred in its calculation of his base offense level based on the finding that Walls's fire created a substantial risk of harm to another person. Second, he argues that the court erred in applying a two-point enhancement based on its finding that the instant offense was committed in order to conceal another crime. Third, he argues that the court erred in failing to vary downward in its application of the § 3353(a) factors, resulting in a substantively unreasonable sentence. His arguments will be considered in turn.

## A. *Substantial Risk of Death or Serious Bodily Injury*

Section 2K1.4(a)(1) provides for an offense level of 24 if the offender knowingly "created a substantial risk of death or serious bodily injury to any person other than a participant in the offense." It requires proof of the knowing creation of a substantial risk of death or serious bodily injury. It does not require proof that death or serious bodily injury actually resulted. *United States v. Farish*, 535 F.3d 815, 825 (8th Cir. 2008).[2] Still, this requires more than the ordinary risk that responding to a

---

[2]Application Note 2 to § 2K1.4(a)(1) states that this risk "includes creating that risk to fire fighters and other emergency and law enforcement personnel who respond to or investigate an offense."

fire poses to firefighters; otherwise, every offense that involved firefighters would trigger this provision. *See United States v. Honeycutt*, 8 F.3d 785, 787–88 (11th Cir. 1993). The district court determined that Walls had a base offense level of 24 based on the risk posed to firefighters who responded to the fire.

Walls argues that any risk was speculative because the only people near the fire were firefighters, who are trained professionals and "presumably" wore protective gear. Appellant's Br. at 11. Walls is wrong. The size of the fire and the ambient conditions amplified the risk of harm to the firefighters. Wimberly's testimony established that firefighters normally would not have engaged a forest fire at night because of the inherently increased danger of fighting a fire with poor visibility. The special circumstance of the fire's close proximity to the Indian House also heightened concern for the safety of others given the presence of the Bidings. Moreover, the fire occurred in a remote area with sloped and rugged terrain. Darkness and difficult topography also combined to enhance the risk of injury. Indeed, one firefighter suffered an injury requiring first aid.

Walls tries to downplay the seriousness of the fire, but his own words belie his contention. As the fire burned, he described the fire as "uncontrolled" and threatening to burn down "half the park." R. Doc. 28, at 6–7. On this record, the district court did not clearly err in finding that Walls knowingly created a substantial risk of death or serious bodily injury in accordance with § 2K1.4(a)(1).[3]

---

[3]Because Walls created a substantial risk to first responders, we need not address whether the district court clearly erred in finding that the fire posed a comparable threat to nearby residents and potential visitors to the park. However, it bears mentioning that firefighters would not have engaged the fire at night were it not necessary to protect a nearby residence and the imminent threat that it posed to the Indian House.

B. *Concealing Another Offense*

Section 2K1.4(b)(1) provides for a two-level enhancement for crimes "committed to conceal another offense." Walls claims that the district court erred in applying this provision. He argues that the court's finding could not rest on his illegally harvesting of timber from public lands. It is undisputed, however, that the record shows that he was illegally harvesting timber from public land, *see* R. Doc. 43, at 20–21, 46; *see also* 18 U.S.C. § 641 (theft of property belonging to United States), and Walls concedes this point in his brief, *see* Appellant's Br. at 12. He nevertheless contends that there was no evidence to support the court's finding that he set fire to his logging debris to cover up the illegal act that created the debris. The record says otherwise.

Walls stipulated in his plea agreement that the special agent who investigated the burned areas determined that Walls had set the fires "to destroy or consume debris he was creating from illegally harvesting timber." R. Doc. 22, at 4. Additionally, Wimberly described in testimony, to which Walls did not object, that the scene "[l]ooked . . . like somebody had cut a tree down on the park and then had . . . split the wood or turned it into firewood and then had burned up the rest of it in an attempt to make it look like it had never happened." R. Doc. 43, at 21. This evidence supports the court's finding that Walls set fire to the debris to conceal his unlawful timber-harvesting.

Walls argues that it would have been "illogical" for him to have set a "large fire" to conceal his illegal acts because that would draw attention to the acts, the opposite effect of what a wrongdoer covering his tracks would reasonably desire. Appellant's Br. at 12. Actually, he set two small fires that only grew into a conflagration after he left them unattended. The district court correctly relied on the record evidence rather than the offender's possible rationales to determine the facts. This argument cannot overcome the clear weight of the evidence. Hence, the court did

not clearly err in finding that Walls set the fire to conceal his illegal harvesting of firewood.

## C. *Substantive Reasonableness*

The district court has "wide latitude to weigh the § 3553(a) [factors] in each case and assign some factors greater weight than others in determining an appropriate sentence." *Washington*, 893 F.3d at 1080–81 (internal quotation marks omitted). A district court abuses its discretion if it "(1) fails to consider a relevant factor that should have received significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *Id.* at 1080. On appellate review, a within-Guidelines range sentence may be presumed reasonable, and the burden falls on the defendant to rebut this presumption. *Id*.

The Guidelines sentencing range of 92 to 115 months' imprisonment, based on a total offense level of 23, exceeded the statutory maximum for Walls's offense, 60 months' imprisonment. The district court elected to impose the statutory maximum 60-month prison term despite Walls's request for a downward variance. The court was within its discretion to do so.

Applying the § 3553(a) factors, the district court found the nature and circumstances of the fire to be aggravating because Walls abandoned the site of a fire that he set in a forest, allowing it to spread, and then avoided reporting it. He placed his personal interests ahead of those of the public as well as firefighters and nearby residents who might be harmed. The court also emphasized that Walls's criminal history was an aggravating factor. Walls's criminal history included convictions that occurred after the instant offense. The district court found that these offenses "show[ed] a continuing course of conduct" that demonstrated "absolutely no respect for the law." R. Doc. 43, at 67. "The district court considered [Walls's] arguments for a downward variance but appropriately exercised its discretion in rejecting them."

*United States v. Lewis*, 593 F.3d 765, 773 (8th Cir. 2010). We discern no abuse of discretion.

III. *Conclusion*

Accordingly, we affirm the district court.

_____